A. R. CASSARD *v.* ANNIE HAYNES CAMPBELL ET AL

5-4528                                425 S. W. 2d 523

Opinion delivered March 25, 1968

*McKay, Anderson & Crumpler,* for appellant.

*Chambers & Chambers,* for appellees.

J. FRED JONES, Justice. This appeal is from a decree of the Columbia County Chancery Court dismissing four complaints filed by the appellant, A. R. Cassard, against the appellees for cancellation of prior oil leases, or for refund of amounts paid by appellant to appellees for oil leases which were encumbered by the prior leases. The cases were consolidated for trial and are consolidated on appeal.

The appellees, Annie Haynes Campbell, Ettie Haynes Halterman and Rachel Haynes McDonald, owned undivided one-third interests in twenty acres of land in Columbia County. The appellees Cary Haynes and his wife, Ozela, owned a forty acre tract and Cary

Haynes was guardian of the estate of his father, J. W. Haynes, who also owned an additional twenty acre tract in the same area. Appellee, Naomi Haynes Wynne, also owned a twenty-acre tract in the same area.

On June 9, 1961, all the appellees executed oil and gas leases to J. Howard Hooper for a primary term of five years. The record is not perfectly clear, but apparently on June 12, 1961, Hooper assigned these leases to Continental Oil Company. On July 6, 1962, Continental assigned to Hunt Oil Company that part of the leases covering only the Pettit lime formation which is a shallow formation. The north Shongaloo Pettit Lime Reservoir was unitized under order of the Arkansas Oil and Gas Commission in October 1961, and appellees' land was included in this unit.

This being the situation, in June 1964, appellant took five year standard leases from the appellees and paid them $50.00 per lease acre for the leases. Upon concluding that the unitization order (referred to by some of the parties as "water drive") constituted a legal unitization, and apparently recognizing the perpetuation of the prior Hooper leases thereunder, appellant attempted to obtain releases from the assignees of the prior leases and being unable to do so, he filed suit in chancery praying an order requiring appellees to either deliver to appellant a release of the prior oil and gas leases, or refund to appellant the amounts he paid for the leases.

The chancellor dismissed the complaints for want of equity and on appeal to this court appellant relies on the following point for reversal, stated in question form, as follows:

"Is a warranty clause in an oil and gas lease defeated by actual or constructive knowledge of a prior, valid oil and gas lease?"

The leases to the appellant contained warranty clauses as follows:

"Lessor here warrants and agrees to defend the title to the land herein described, and agrees that the lessee shall have. the right at any time to redeem for lessor, by payment, and mortgages, [sic] taxes or other liens on the above described lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof."

Appellant testified that he did not know of the unitization, and in this connection testified as follows:

"Q. Did you know that there was unitization down there to the Pettit lime?

A. No, of course not. I had heard that, some of the people involved in this had mentioned the fact that there possibly could be.

Q. You say you didn't know about it and then you say that they told you about it?

A. They told me there was a possibility. However, I asked them if any consideration had been paid or if they were getting royalties or any rentals of any type, at least within the last 12 month period and they all told me no, so I presumed that certainly any valid water flood or any type unitization would have expired.

Q. In other words, you were aware that there was a unit down there at one time?

A. Yes, I didn't know exactly what it covered.

* * *

Q. Do you recall discussing with Mr. Cary Haynes and Mrs. Wynne the Pettit lime being connected with the water drive?

A. I don't particularly recall the discussion, I am not denying I had a discussion, I just don't recall it.

Q. Isn't it a fact that they were very hesitant to sign a lease and told you they didn't want to?

A. Yes, I do recall that.

Q. And didn't you insist that they sign the lease?

A. Possibly fifty dollars an acre might have done the insisting, I didn't.

Q. You talked with them considerably about it after they were hesitant to sign?

A. Yes, they were hesitant.

Q. And they were hesitant due to the fact that a lease was signed a few years before that they were in doubt about?

A. That was the prime reason.''

Appellant's attorney, who examined the abstracts of title and prepared the leases, testified from his memory, as follows:

''Mr. Cassard mentioned to me that part of the leases down there were in this unitization but he said that the unit wasn't any good, that they hadn't been paid any money, they hadn't ever received any money, and that he was having it omitted from the abstracts, but the abstractor still placed a little notice in there that by request the unitization is there of record but at the request of the party for which they were preparing it, that they had omitted same and would furnish it upon request. * * * According to my recollection, he was sure that the unit was no good.''

The testimony of all the appellees was substantially the same as that of Mr. Cary Haynes who testified on direct examination by his attorney as follows:

''Q. You know the Plaintiff, Mr. Cassard?

A. I do.

Q. Will you relate the conversations and business dealings you had with him pertaining to leases down there?

A. Well, Mr. Cassard came to me and wanted to lease the land. I told him I understood we couldn't lease the land, we had been forced under a water drive, you know, Mr. McKay and them, the attorneys and everybody, and we fought the water drive but the conservation people ruled for them. I told him that Continental had my lease down there, if you want the history, but they had failed to pay the rentals on it and Cassard told me, he said, 'As far as the water drive, I am not interested in it.' He said, 'I am interested in deep stuff and as far as the water drive, it's not worth the paper it's wrote on, you have got to have a unit to have a water drive, you have got to have so many wells to form a unit and you aint got that kind of wells here and it's not worth the paper it's wrote on and if you will sign a lease to me I have got fifty dollars an acre for you,' and I was fool enough to sign it. He brought me one form of lease, I believe oil and gas and mineral deed it called for, and I came to you and told you about it and you told me to change leases and I got an 88 1/8 form and went to his office and I told him the form changed and I wanted it put in there, 'Understanding there being a lease under a water drive,' and his secretary called Mr. Cassard and held it up and he said, 'That is all right, go ahead and fix it up,' and they did. . . .

\* \* \*

Q. And then also, you did request him you said, to put in there 'Subject to the water drive'?

A. I certainly did.''

The unitization order was of record in Union County and there is no question that all the parties, including the appellant, had actual knowledge as well as constructive notice of its existence. We do not have the prior

leases before us but apparently appellees thought they had expired under some rental provision of the leases. Appellant was *quite sure* they had expired if no delay rentals or royalty had been paid to the appellees for a period of one year. As a matter of fact, appellant was quite sure that the recorded unitization order was invalid.

As we view the record in this case, the existence, or the validity, of the "water drive" or unitization, is only important insofar as it affects the validity by perpetuation of the prior leases. Neither the Hooper leases nor their assignments to Continental and subsequent partial assignments to Hunt are in the record before us, so we are unable to determine what delay rentals, if any, were required to maintain the Hooper leases in force, and what attempt was made, if any, to vertically segregate that portion of the Hooper leases which was reassigned to Hunt within the unitized Pettit Lime Reservoir, from that portion of the Hooper leases retained by Continental outside the unitized Pettit Lime Reservoir. Consequently, we are unable to determine whether that portion of the Hooper leases retained by Continental remained subject to the payment of delay rentals after the unitization and assignment to Hunt, if in fact, the Hooper leases did contain delayed rental clauses at all.

It was stipulated, and the record indicates, that appellees were never paid any delayed rentals under the Hooper leases, but there is nothing in the record to show what delayed rentals, if any, should have been paid under these leases. The record indicates that the Pettit Lime Reservoir was being depleted and was unitized as a conservation measure under a water drive recovery method, and that production was being maintained from the unit outside the actual acreage belonging to appellees. In any event, throughout the trial of this case, all parties seemed to recognize that the appellees' land was within a pooled unit and that the unitization was legal and of full force and effect at the time of the trial.

Vertical segregation is not alleged or argued, so it would appear that all parties recognized the perpetuation of the original leases by the unitized production.

This being the situation, appellant got nothing for his money except some experience and the right to contest the legality of the prior leases, if he desired to do so. Appellant was not obligated to defend his title against the prior leases, this was an obligation appellees agreed to assume under the covenants of warranty in their leases to the appellant. Appellees followed their attorney's advice in demanding a change in the lease forms in leasing to appellant, but instead of leasing subject to the prior leases as their attorney advised them to do, they leased to appellant without restriction and they warranted title which they apparently now recognize that they did not own.

Appellees argue that appellant simply took a chance on becoming wealthy from the production he hoped to obtain from deep oil formation, and that he perpetrated a fraud upon appellees in procuring the leases. As we read the record, appellees were receiving no royalties under the prior leases and they would have become at least one-eighth as wealthy as appellant would have become under the terms of their leases to him. We fail to follow appellees' reasoning as to fraud practiced by appellant, when he was the one who had changed his position by paying to appellees $3,750.00 for something they had already sold and did not own.

There is no question in this case that all of the appellees knew that they were selling to appellant outright leases when they signed the forms, and there is no question that they knew that they had already leased the same minerals to Hooper when they leased to the appellant and accepted his money under covenants that they would warrant and defend their title. The evidence is quite clear in this case that appellees thought that perhaps the original leases to Hooper had terminated, or at least their validity was questionable, because of the

failure to pay delay rentals. There is no question that appellant knew of. the prior leases and that he was even more sure than appellees that the prior leases had' been abandoned, had terminated, or at least were invalid. Nevertheless, appellees warranted their title and agreed to defend it and it now appears that the appellant and appellees have concluded that the prior leases were valid when the leases to appellant were executed, or at least it is evident that they have concluded that litigation will be necessary to determine the validity of the prior leases, and the obligation rests on appellees to carry out that determination under the warranty clause of the leases they executed.

Appellant's knowledge of the prior leases does not relieve appellees from the obligations of their covenants of warranty and their obligation to defend the title to the oil and gas they sold to appellant under the terms of their leases to him. *Oklahoma City* v. *Harper et al,* 180 Pac. 2d 162; *Texas Co.* v. *Snow,* 172 Ark. 1128, 291 S. W. 826; *Gude* v. *Wright,* 232 Ark. 310, 335 S. W. 2d 727.

The evidence is convincing that appellant was fully advised of the unitization of appellees' lands under the so called "water drive" in. the Pettit lime formation, but being interested in the deep production areas outside and beneath the unitized area or zone, he intended to lease the deep formation regardless of the status of the Pettit lime formation which he considered of little consequence as well as invalidly unitized. Aside from the covenants of warranty in this case, if the entire lease to Hooper is being perpetuated by unitized production, equity and good conscience demands that appellees either refund to appellant the money he paid to them, or that they deliver to him the title they warranted that they owned. Under the covenants of warranty, the law requires that this be done.

If the original leases to Hooper have been segregated as to deep and shallow oil pools or sand, and the

leases as to the deep oil have not been perpetuated by production from the unitized Pettit pool, and if the segregated portion of the Hooper lease has expired for nonpayment rentals, or for any other cause, it may be that appellees are in a position to deliver to appellant all that he was interested in (the deep oil) and all that he bargained for (beneath the unitized Pettit lime) when he procured the leases. Consequently, in such event, the appellees should have a reasonable time in which to clear their title to the minerals they leased to appellant before being required to refund the purchase price. If appellees are unable to deliver good title to at least the area beneath the Pettit lime formation within a reasonable time fixed by the court, appellees should be required to refund the amounts appellant paid them for the leases.

We are of the opinion that under the circumstances of this case, the appellant is not entitled to interest on any amount refunded and that all parties should bear their respective costs.

This cause is reversed and remanded for further proceedings not inconsistent with this opinion.